Dr. Dan Shuster Dr. Dan Shuster Good afternoon. We already had some argument today about the application of the Prompt Pay Statute to self-funded plans. I want to begin by talking about the application of the statute to fully funded plans. There really isn't any dispute that the statute, as written, applies to fully insured health insurance plans. And I want to talk about the fully insured plans, or claims, that are at issue in this case. And I'm referring to the Blue Card plans. There are two different kinds of Blue Card plans that are administered by Healthcare Service Corporation. One of them involves claims where you have different divisions of Healthcare Service Corporation administering claims for each other. On the very last page of Healthcare Service Corporation's brief, and the very last footnote, HCSC acknowledges that a few out-of-state Blue Plans are insured or administered through HCSC's other operating divisions. HCSC has divisions here in Texas, in Oklahoma, Illinois, Montana, and New Mexico. So these Blue Card plans are plans in which, for example, a beneficiary under a plan issued by HCSC in Illinois comes to Texas and receives care from a Texas provider, and that claim is administered by Blue Cross Blue Shield of Texas, which is another division of HCSC. But in that situation, HCSC remains the insurance company. It is always the insurer. There is no corporate distinction between Blue Cross Blue Shield of Texas and Blue Cross Blue Shield of Illinois, or any of the other divisions that are the subject of these Blue Card plans. Those plans, because they are fully funded by HCSC as a licensed Texas insurance company, and involve the payment of proceeds to a Texas provider based on services rendered to a patient in Texas, those claims fit squarely within the statute. HCSC has argued that that constitutes an extraterritorial application of the statute. We can't regulate the policies issued by HCSC in a different jurisdiction outside of Texas. That simply isn't what's happening here because, again, HCSC is a licensed Texas insurance company. There is no extraterritorial application of the statute when we're talking about a licensed Texas insurer, a Texas provider, and a patient receiving benefits in Texas. The other threshold question I wanted to address again, which I addressed briefly a minute ago, is the question of certification. Again, the Toronto case does provide some controlling Texas precedent on the question of whether there is an insurer. But as it relates to the other elements of the statute and whether those provisions apply to self-funded plans, because this is an important issue and it is one that involves determinative questions of Texas law, that issue, the issue of interpretation, should be certified to the Texas Supreme Court. On the question of interpretation, again, the statute requires only that there be an insurer. HCSC is clearly a licensed Texas insurance company. It is operating under Chapter 41 of the Insurance Code, which only requires an authority under a charter to engage in business involving the payment of money or another thing of value in the event of loss resulting from disability incurred as a result of sickness or ill health. Here, what is significant is that in contrast to the Aetna case, the provisions of the Administrative Services Agreement between Blue Cross Blue Shield, or HCSC, and the self-funded plans actually requires Blue Cross Blue Shield to advance payment to the providers and then seek reimbursement from the self-funded plan. So clearly, with that being the case, this is clearly a situation where HCSC is operating under 841 because it is authorized and, in fact, does engage in the business involving the payment of money in exchange for the provision of health care services. With respect to the other elements in the statute, clearly HCSC is authorized to issue, deliver, or issue for delivery in the state of Texas health insurance policies. Therefore, HCSC clearly qualifies as an insurer under the statute. With respect to whether there is a health insurance policy, again, the statute requires that there be a group or individual insurance contract providing benefits for medical or surgical expenses incurred as a result of accident or sickness. Like in the Aetna case, the terms of the Administrative Services Agreement and the Preferred Provider Agreements in this matter with Methodist Hospitals show that this is an insurance contract that provides benefits to the self-funded enrollees. This is the language from the Preferred Provider Agreement, the record at 1247. BCSC, Texas, will pay to the point-of-service member hospital the amount of its obligation under the POS Subscribers Health Care Coverage. POSH has been approved by Blue Cross Blue Shield of Texas to submit Blue Cross Blue Shield of Texas claims only for the categories of services containing an X in the box. If you look at the chart underneath medical and surgical expenses, that is checked. That's the record at 1256. Again, this is an agreement whereby Methodist Hospitals is agreeing to provide covered medical procedures and health care to members of these self-funded plans in exchange for the payment of health insurance proceeds from the administrator. Therefore, it qualifies as a health insurance policy under the terms of the statute. You're asking us to read that in conjunction with another document, aren't you? You can read them independently or you can read them in conjunction. And the other contract that you can read it in conjunction with is the Administrative Services Agreement. This is an excerpt from that agreement, the record at 1216. Are you saying the first one, standing alone, equals a policy? Yes. It's clearly... And the second one, standing alone, not read in conjunction with the first, equals a health insurance policy? Yes. Either independently or construed together, they qualify as a health insurance policy because they provide benefits for medical and surgical expenses incurred as a result of accident or sickness. The language from the Administrative Services Agreement, again, the record at 1216, all payments made by the claim administrator for the benefit of any covered person may be made directly to any provider furnishing covered services for which payment is due, and the claim administrator is authorized to make such payments directly to providers. So again, this is a situation where it's not as though the fully funded plan is making payments to the provider. These payments are being made by the third party administrator, in this case, HCSC. And as a result of that exchange, this qualifies as a health insurance policy. But where the insured is the employee. Is that right? Yes, that's right. Of course, obviously, as I argued a minute ago, the self-funded plan document also provides a basis to find that there is an insurance policy in that context. There is no, really no dispute that these documents provide differing levels of coverage based on whether the provider is a preferred provider or a non-preferred provider. And therefore, if you look at the terms of 1301.041, each of those elements, an insurer, the insurer's health insurance policy and the provision of different levels of coverage is met. And as a result, the statute can be applied to self-funded plans. In the time I have remaining, I just wanted to address the preemption issues. And again, to put this in context, if you take the, if you take HCSC's argument to its logical extreme, if asserting a claim under the Texas Prompt Payment Statute somehow implicates a federal area of, an exclusive area of federal concern, or if it somehow implicates the relationships between traditional ERISA entities, any contract would be subject to preemption. Take, for example, in Texas, we have a statute that authorizes the payment of attorney's fees to the prevailing party. This is Chapter 38 of the Insurance Code, of the Civil Practice and Remedies Code. That's not a regulation of an insurance policy. Prejudgment interest is assessed in cases pursuant to statute. That's not a preempted statute. But if you take the arguments that you're going to hear from HCSC to their logical conclusion, then any statute, any contractual relationship that a plan enters into with a third party for utilities, for any, anything, would arguably be preempted under the way that they've interpreted the preemption doctrine. That's simply not the case. The provisions or the test that is to be applied for preemption and express preemption, which is really, there is no argument about complete preemption or conflict preemption raised by HCSC, is that there has to be an exclusive area of federal concern addressed by the statute, and it has to impact traditional or as entities. It's important that in this case, Blue Cross Blue Shield of Texas, in the Administrative Services Agreement, disclaims any fiduciary designation with respect to the plan. If Blue Cross Blue Shield is not a fiduciary, and obviously the hospital is not a fiduciary, how can there be any impact on the relationship between traditional or as entities by virtue of application of this statute to the self-funded plans? Simply not there. With respect to preemption under Section 2259.037 of the Government Code, this is another argument that HCSC has made. That statute actually requires the same relationship. The statute says that the insurance code and other laws of this State relating to the provision or regulation of insurance do not apply to an agreement entered into under this subchapter or to the proceeds of public securities issued under this subchapter. Again, the language speaks specifically to relating to relationship. Because this is not, for the same reasons that ERISA preemption doesn't apply, preemption under 2259.037 also does not apply. There admittedly is not a whole lot of authority in this area that interprets this particular case involved a beneficiary who was trying to argue that the government-funded insurance plan should have included some kind of uninsured motorist coverage. That's really not anyway analogous to what we're talking about here. Number one, it's not a claim by a beneficiary. It's a claim by a provider who is a stranger to the self-funded plan and only has a contract with the third-party administrator. In addition, we're not implicating anything having to do with the coverage under that plan, as was the case in the Hill matter. Finally, and with respect to FEBA preemption, again, the terms of Title V, Section 8902 state that the terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits shall supersede and preempt any State or local law or regulation issued thereunder which relates to health insurance or plans. There have been several cases including the Blue Cross Blue Shield of Florida case and the McVeigh case that have found that the analysis, the preemption analysis under FEBA is consistent with the preemption analysis under ERISA. In fact, the McVeigh case says that preemption under FEBA is actually more narrow than preemption under ERISA. So for the very same reasons that preemption doesn't apply in the ERISA context, it doesn't apply in the FEBA context. Now, Healthcare Service Corporation has cited the Berkey case as a reason why FEBA preemption would apply here. That case involved a mother who was trying to obtain health insurance benefits for her son after a car accident. Again, that was a claim by a beneficiary under a plan contesting the coverage afforded under that plan. That obviously does impact the actual plan determination. By contrast, the claims made under the TPPA don't include any addition, any implication with regard to the coverage under the plan. But imposing penalties for failure to promptly pay, your contention is that doesn't affect plan obligations? It doesn't affect anything having to do with the coverage under the plan. Whether there is coverage or not is independent of whether there is timely payment and whether the payments are subject to penalties. And the distinction there is clearly made in the Cedars-Sinai case. This is a Ninth Circuit case from 2007 in which that court specifically found that because that was a claim by a provider seeking to assert its right under contract and under other statutes to obtain coverage or payment for services that were rendered, that was distinguished from cases where the beneficiary was actually seeking coverage under a plan document. In the Botsford case, for example, it was the case that Cedars-Sinai distinguished. The reason that was distinguished was, again, because Botsford included a beneficiary's claim under a plan. So just in conclusion, and I'll reserve my time, but with respect to preemption, again, for the very same reasons that ERISA preemption doesn't apply, and this has been found by the several cases I mentioned a few minutes ago, there is also no preemption under Chapter 2259 of the Government Code as well as under FVLA. I'll reserve the rest of my time. Yes. Thank you, Mr. Skidmore. You've saved time for rebuttal. Mr. Bishop? Good afternoon, Your Honors. May it please the Court. My name is Martin Bishop. I'm here on behalf of Blue Cross and Blue Shield of Texas. I'd like to cover two issues. Most importantly, the applicability section of Chapter 1301 and how it applies to claims submitted by Methodist when Blue Cross and Blue Shield of Texas is not acting as an insurer and has not issued a health insurance policy. And second, I'd like to talk a bit about FEBA preemption. I'd like to pick up a little bit on, before I jump into that, about what, from Mr. Skidmore's argument, and note that what is apparent from our perspective is that what the hospitals, or in our case Methodist, is trying to do in both of these cases is directly or indirectly regulate the plan, whether that's done through a number of the theories that are argued here. I'm going to talk about those. The result is the same. It's not sanctioned by Section 1301 and it's prohibited by ERISA. And I think that's a theme that runs through the arguments that I'm going to make here today and that permeated our briefing. We're talking about two kinds of preemption here, are we not? ERISA and FEBA. Correct, Your Honor. With respect to some number of claims in our case, there is a FEBA preemption argument, yes. We have to address whether Judge Boyle got both of the preemptions correct. In our case, it's definitely FEBA preemption. In our case, Judge Boyle did not reach ERISA preemption as Judge Lynn did in the Aetna case. But we did advance ERISA preemption, express preemption before Judge Boyle. She just did not reach that issue because she doesn't apply to these all but the FEBA plans. Time permitting, I'll address some of the other issues. I would like to, as I move along here, talk a bit about the blue card issues that Mr. Skidmore raised and that Methodist raised in its brief as well as the hospitals did in their amicus brief. As to the insurer point, as the district court found, in large part the case rises or falls in terms of statutory construction on that applicability section in Chapter 1301.0041A is the citation for that provision. That section unambiguously provides in plain, stark language that the chapter only applies where an insurer has issued a health insurance policy. These terms, insurer and health insurance policy, are key terms in this dispute when it comes to the issue. I would argue, or at least advance the position, that there's no need for this court, as has been suggested, to send this or certify the question over to the Texas Supreme Court because the language is plain and clear. Other courts have found not this provision hasn't been interpreted, but other provisions of 1301.00 are plain and clear, something this court does on a regular basis. We don't think you need to send this over to the Texas Supreme Court to get guidance on how to interpret that plain language. Where Blue Cross and Blue Shield of Texas was merely administering claims, which is administering claims submitted by Methodist, which is the subject of our dispute, Blue Cross and Blue Shield of Texas wasn't acting as an insurer at that time and didn't issue a health insurance policy. As we know, Methodist attempts to make something out of the fact that Blue Cross and Blue Shield of Texas qualifies as an insurer in some context, and therefore Methodist argues it's always an insurer. But that can't be the way these statutes work. Blue Cross and Blue Shield of Texas wears, if you will, different hats at different times. When it's acting as an insurer, it's wearing its insurer hat, and it's regulated as an insurer. There are specific provisions in the Texas Code that regulate Blue Cross and Blue Shield of Texas as an insurer. At other times, it has its hat on as a third-party administrator, and it's acting and is regulated under sections of the Texas Insurance Code that apply to third-party administrators, Chapter 4151. So why do you think it was then that the legislature put this particular part of the statute under the umbrella of parties that are insurers? Sorry, Your Honor. No, go ahead. Why did it include the definite, if I understand your question, why did it include insurer in the applicability section? Right. It would be our position, Your Honor, that the legislature knew how to differentiate between the roles of an insurer and a third-party administrator. It did so in the Code generally. It has provisions that apply to insurers. It has provisions that apply to third-party administrators, and it did so in Chapter 1301. There are provisions that talk about third-party administrators in Chapter 1301. Notably, not in Section 0041A. So the legislature knew how to make the distinction. It just did not do so when it went through this applicability provision at the outset of Chapter 1301. And this notion that Blue Cross and Blue Shield of Texas can be regulated differently depending on what it's doing as opposed to, as Methodists advance, being regulated as an insurer no matter what it's doing, has analogs in the law elsewhere. For example, in the commercial driving context, an individual can get licensed for personal driving, an individual can get a commercial driver's license, and an individual can get its commercial driver's license endorsed with the ability to drive around hazardous materials. Now, when an individual is driving around in each of those capacities, it's regulated differently. It's regulated differently with respect to driving under the influence, with respect to use of cell phones, all sorts of things. And if you're driving, if I was driving my pickup truck down the road with no hazardous material in the back, I'm not going to be held to the same standards I would have been held if I was driving with nuclear waste in the back of my pickup truck. In the commercial context, there's myriad examples of the same thing. Think of financial institutions. Banks operate as lenders. They operate as savings institutions. And when they're doing those things, they're regulated differently under different statutes. And we would argue, Your Honors, that the same should apply here. When Blue Cross and Blue Shield of Texas is acting as an insurer, it is an insurer. When it's not, and it takes that hat off and is acting merely as a third-party administrator, as it is with respect to every single claim that we're talking about under the applicability section, it should only be regulated as a third-party administrator. And the Toronto decision that Methodist relies on heavily supports that notion. There are, they're under a different definition of insurer. The, the Texas Supreme Court held that Blue Cross and Blue Shield of Texas was an insurer. But that statutory provision that the Texas Supreme Court relied on for the definition of insurer referred to third-party administrators. And therefore, because it was acting as a third-party administrator, even though it was set up as a hospital services corporation at the time, and that provision wasn't included under the, the definition of insurer that was at issue in Toronto, the court found that it was acting as a third-party administrator, and therefore it could be regulated as an insurer in that context. It supports the notion that the Texas Supreme Court looks to the hat that an entity is wearing as opposed to just whether somebody, whether an entity qualifies as an insurer at the, at one time, and therefore is always an insurer. With regard to the claims where Blue Cross and Blue Shield of Texas didn't issue a health insurance policy, Blue Cross and Blue Shield of Texas was acting as a third-party administrator, even though it was licensed as an insurer. As, as Judge Boyle found at the district court level, Blue Cross and Blue Shield of Texas just is not an insurer when it's merely administering and not providing insurance and not bearing the risk of loss, which is a hallmark of, of insurance. That doesn't occur as, when Blue Cross and Blue Shield of Texas is not administering the claims. The district court also found that Chapter 1301 requires an insurer to issue a health insurance policy in Texas, and with regard to self-funded plans, both private and state government plans alike, and the Blue Card claims, Blue Cross and Blue Shield of Texas didn't issue a health insurance policy. With no health insurance policy, even if Blue Cross and Blue Shield of Texas is an insurer at all times, no matter what hat it's wearing, Methodist cannot still get past this applicability section. Methodist puts a lot of stock in the fact that its PPO contract with Blue Cross and Blue Shield of Texas can be construed as a health insurance policy or that you can put, connect together a bunch of different contracts with, including Blue Cross and Blue Shield of Texas's third-party administration agreements with, couple that, that agreement with the PPO contract and, and hobble together a health insurance policy. Well, he said standing alone, it could be read the same as an insurance policy. Yeah, and, and, and I disagree with that, Your Honor, and, and I'm going to explain why. There, there are many reasons why it's wrong. We talked a lot about those reasons in our brief, but I'd like to talk about a textual reason here today. And if, if you take the term preferred provider contract or take the term third-party administration agreement and substitute that throughout Chapter 1301 where the legislature used the term health insurance policy, definitions and terms in that statute become incomprehensible. And let me give you a couple of examples. The definition of preferred provider, which is that 1301.01 sub 8, that provision provides that a preferred provider becomes, is a doctor who contracts with an insurer to provide health care to insurers covered by a health insurance policy. A substitute out preferred provider contract for health insurance policy or third-party administrator agreement or both of them for health insurance policy. And the way that a doctor contracts with an insurer to provide health care to insurers covered by a PPO contract, covered by a third-party administrator agreement, or by both. That is incomprehensible. Insurers aren't covered by such agreements. There's no insurance. The same thing applies for the definition of preferred provider benefit plan where the use of health insurance policy is an institutional provider. And I think it's important to note, and there's other examples in the statute, but I think it's important to note that the legislature actually knew how to distinguish between the two things, between a health insurance policy and a preferred provider contract. There's a definition of service area in the statute 1301.01 sub section 10 where the legislature distinguished between the two things. It provided that a service area is, among other things, and then it says that it distinguishes between a health insurance policy and a preferred provider contract. So if health insurance policy includes preferred provider contract, why in the definition of service area would the legislature need to distinguish between the two? And it did not need to. And again, you've got to look to the nature of these contracts. Preferred provider contract is a contract between Blue Cross and Blue Shield of Texas and Methodist where the quid pro quo is access to a network in exchange for discounted rates. That's the contract. Third party administration agreement is a contract between Blue Cross and Blue Shield of Texas and any number of plans to administer the claims that that self-funded plan has taken on the responsibility for. Those are not health insurance policies. Completely different. Now, I want to go a little deeper on this unified contract theory that Methodist advances. One question I have about this, and perhaps your honors have considered it as well, is what's the contract? What is this contract that is unified? What does it cover? There's no answer for that in the papers. District court never had the opportunity to address it. And Methodist advances, no position here today or elsewhere about what that contract is. What is it? And who is it between? Because Blue Cross and Blue Shield of Texas has one PPO contract with Methodist, but it has 80,000 providers in the state of Texas. All those contracts, part of this unified contract, has roughly 40,000 groups. All those ASA groups, all those ASA contracts, part of this unified contract, there's no explanation for that. And as I'm sure you're realizing, the reach of that is absurd. And why isn't the plan a part of this unified contract? Well, I mean, the answer to that is because it would clearly be preempted by ERISA. But wouldn't that be necessary to complete this unified contract? I mean, that's what Methodist argued below. They've abandoned that here. The cases that, the Baylor case that Methodist relied on for this unified contract theory is distinguishable. And it's been distinguished by a number of subsequent cases, federal district courts. And the one I want to focus on is the Memorial Hermann case, Memorial Hermann versus Coastal Drilling 12F Sub 3rd 1001, a southern district case from Texas in 2014. Importantly, in Memorial Hermann, the court found no unified contract where, and I'm quoting from page 1016 of the opinion, the parties expressly disclaim an intent that third parties obtain enforceable contract rights under it. Now, both contracts at issue here in this single unified theory, the PPO contract and the administrative services agreement have integration clauses. The PPO contract's integration clause is record on appeal 1252, and the administrative services agreement is record on appeal 1206. Those are where the integration clauses are. And like the Memorial Hermann case, the administrative services agreement expressly disclaims that it's conferring any right on anybody who is in a party to the administrative services agreement. So that, in and of itself, and that's the record on appeal at 1203 at paragraph 14.2, should dispense with this notion that somehow the court can hobble together a bunch of agreements and constitute a health insurance policy, putting aside the fact that none of those agreements confer benefits on an insured, which is a reason in and of itself. One other quick point I'll note here on the applicability section before I talk about FIBA preemption is the history. This statute's been in place and operated the same way for a long time, a very long time. Everybody, the payers, the third party administrators, the insurance companies, the providers, the regulator, the Texas Department of Insurance, have all applied it the way we're advocating for its application here today. And as we cited cases in our briefs, that's important because the legislature has amended the statute several times over the course of the decades plus that this statute has been in place. And it has never, ever touched, changed that requirement that an insurer issue a health insurance policy in the applicability section, not once. And it has acquiesced as a result to that construction of the statute. FIBA preemption. So as this quote preempts the prompt payment provisions of the insurance code because the FEP contract with the Blue Cross and Blue Shield Association is for the provision of health care benefits for federal employees. And the insurance code attempts to set payment deadlines for claims under these prompt pay provisions, but that's covered by the FEP contract. And it's a direct conflict as a result. And as this court noted in Berkey, if a statute addresses proper claims handling, in other words, the way a claim is paid, it relates to the FEP plan. And that's exactly what's going on here under the construction that Methodist is offering. The statute at issue in Berkey was a penalty statute like the penalty provisions in Chapter 1301. And just as was the case in Berkey, the court should find here that Methodist FEP claims are preempted and on that ground affirm the summary judgment decision of the district court's ruling there. And it's important to note that uniformity is at issue here. That's an underlying principle in FIBA. It's an underlying principle in ERISA. And as we pointed out in our brief and some of the amici pointed out in their briefs, there are differing schedules of prompt payness around the country. Different states have different statutes and have different time requirements. If the federal employee plan had to address and deal with different statutory time payments all around the country, it would violate uniformity. If self-funded plans had to address different payment schemes around the country, it would violate that uniformity notion. And one, you know, point I'll make because Mr. Skidmore mentioned it, is this notion that the beneficiary, that there's a beneficiary in Berkey and that matters. But if you look at this, a case that this court relied on in the Berkey decision, among other cases we cited in our briefs, this court relied on Blue Cross and Blue Shield of Florida versus the Department of Insurance. And in that case the court found that there was preemption even though there was no plan beneficiary. The state had brought the claim there wasn't a plan beneficiary at all. I see that I'm out of time, Your Honor, so I thank you for your time. And I will turn the microphone over to Mr. Skidmore. All right. Thank you, Mr. Bishop. Mr. Skidmore, you've saved time for rebuttal. Thank you, Your Honor. Historical behavior of parties is not a rule of statutory construction. It doesn't have any relevance to the terms of the statute. The idea that the Texas Department of Insurance has passed on this issue and already decided that self-funded plans are not governed by the Prompt Payment Act, if you look at the actual statements by TDI that are cited in HCSC's brief, in none of them is there any explanation of why that result is concluded. We don't know whether it was based on an interpretation of the statute or whether it was based on some assumption made about preemption. Obviously, TDI is not entitled to any deference with respect to its opinions about preemption. And to the extent that it hasn't rendered any interpretation of the statute, there is no deference that's accorded or appropriate for the statements by TDI. I want to address Do you agree that we only get to considering things like that if there's a determination that the statute is ambiguous somehow? Well, I think under the government code, the court can look at legislative history even in the absence of an ambiguity. But if the court thinks there's an ambiguity, obviously, it's appropriate to look at legislative history as well. But I want to address this idea that somehow these statutes are binary, that if you are a TPA, you're only a TPA, you can't be an insurer, or if you're an insurer, you can't be a TPA under Chapter 4151. That's simply not how these statutes operate. If you look at Chapter 4151, because HCSC is functioning as an insurer, it is not textually a third-party administrator subject to that statute. But there is nothing in the actual language of the statute that defines insurer for purposes of 1301 that requires that there be an assumption of risk. Likewise, in the definition of insurance policy, there's nothing in that definition that requires that there be a transfer of risk between one party and the insurer. And in fact, in the definition, the applicability provision of the statute, there's actually no requirement that an insurer issue a health insurance policy. All that is required in the definition of insurer is that there be an authorization to issue a health insurance policy. In this case, and there was a question earlier about, well, what happens if there's a determination or a question about the subject of these penalties? In this case, by definition, in the complaint that was filed by HCSC, the only claims that are at issue here are claims that have been paid. Therefore, there is no determination or no dispute about coverage, but the claims have been paid late. The record site there is record at 67. The other issue I wanted to address is the idea that somehow if you interpret the insurance policy to be either the administrative services agreement or the preferred provider agreement, that somehow other provisions in the statute are, I think the word was incomprehensible. There's nothing incomprehensible about the idea that there is an administrative agreement that governs a certain set of plans and that by virtue of that governs a certain set of beneficiaries under those plans. There's nothing extraordinary about that at all. There's nothing extraordinary about the idea that an administrative, that a preferred provider agreement would reach a certain set of beneficiaries under a certain set of plans. In the absence of that preferred provider agreement, those beneficiaries don't have access to that provider. It's like when you want to go to a doctor, you need to make sure that that doctor is covered by your plan and that there's an agreement in place between your third party administrator and that provider. Obviously, those enrollees are covered by that agreement because that's the agreement that gives them access to health care from that specific provider. Well, at least health care at the lower rate, right? That's right. They could independently use that provider. Right. But there's nothing, again, the idea that somehow these beneficiaries can't be covered by that agreement. Obviously, they are because they take advantage of it by going to that doctor and receiving services from that individual. The idea that there can't be a unified contract because there are integration clauses, and I want to read or refer to the administrative services agreement, which specifically refers to a number of other contracts. This is a record 1194. The employer has established and adopted an employee welfare benefit plan as described in its plan document. It's referring to the summary plan description that we referred to earlier. Record again in 1194. The allowable amount, this is how much is going to be paid for a provider who has a written agreement with the claim administrator or another Blue Cross or Blue Shield plan to provide care to a covered person at the time covered services are provided. It's referring to a separate contract with the claim administrator and the provider. The definition of network refers to health care facilities that have entered into agreements with the claim administrator. The fact is, there are references all throughout the administrative services agreement and the preferred provider agreement to other contracts, including the administrative services agreement, in the case of the preferred provider agreement, and vice versa. So there's nothing inconsistent with the language of those contracts and construing them consistently. With regard to the integration clauses, those integration clauses refer to... Your time has expired now, Mr. Gidmore. Thank you, Your Honor. Thank you, and your case is under submission. The court will take a brief recess before hearing the final three cases.